# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

OSCAR HERNANDEZ,

     Plaintiff

v.

THE HOME DEPOT, INC. and RIDGE
TOOL COMPANY,

     Defendants

Case No.: 2:22-cv-00938-APG-EJY

**Order Granting in Part Defendants'
Motion for Partial Summary Judgment**

[ECF No. 37]

Oscar Hernandez was allegedly injured while using a "RIDGID" branded nail gun.  He sues The Home Depot, Inc. and Ridge Tool Company under theories of (1) strict liability, (2) negligence, (3) breach of express warranty, and (4) breach of implied warranty of fitness.  The defendants moved for partial summary judgment as to Ridge Tool Company, arguing that it played no role in the design, manufacture, distribution, or sale of the nail gun, or in the formulation of its warnings, other than to license the RIDGID trademark to The Home Depot. They argue that a mere licensor of a trademark cannot be held liable for a defective or unreasonably dangerous product.  Hernandez responds that Rigid Tool Company is strictly liable for the nail gun under either the apparent manufacturer doctrine or the stream of commerce approach.[1]  I grant the motion for partial summary judgment as to the negligence, express warranty, and implied warranty claims.  In a separate order, I will certify a question to the

---

[1] Alternatively, Hernandez requests in his opposition that I "substitute the manufacturer [of the nail gun] for RIGID [Ridge Tool Company] in this matter" because "[t]he allegations of the Complaint . . . make it clear the party identified as RIGID referred to the manufacturer of the subject gun." ECF No. 38 at 5-6.  This request fails because he does not identify a specific party to substitute,  a new party can be added only through an amended pleading, and he has not moved to amend the complaint. *See* Fed. R. Civ. P. 15(c); LR 15-1; LR 26-1(b)(2).

Supreme Court of Nevada regarding whether a trademark licensor is subject to strict products liability.

## I. BACKGROUND

Hernandez alleges that he was injured while using a RIDGID branded nail gun while on a construction site. ECF No. 10 at 4.  Hernandez's employer allegedly purchased the nail gun from The Home Depot. *Id.*  The nail gun and its packaging both prominently bore the RIDGID name and trademark. ECF Nos. 38-1; 38-2.

"The 'RIDGID' brand is known throughout the professional trades for its hallmark characteristics of dependable and reliable performance." ECF No. 37-2 at 3.  In 2003, "Ridge Tool Company and/or its affiliated companies licensed the 'RIDGID' trademark to Home Depot."[2] ECF No. 13 at 2.  Under that licensing agreement, The Home Depot used the RIDGID trademark to market and retail a line of power tools, including the nail gun used by Hernandez. ECF Nos. 17 at 2; 37-2 at 3-4.  That line of power tools was designed and manufactured "by other companies for, and on behalf of, Home Depot," not by Ridge Tool Company or its affiliated companies. ECF No. 37-2 at 3.  Ridge Tool Company and its affiliated companies were not involved with the design, manufacture, distribution, or sale of the nail gun, nor with the formulation of its warnings. *Id.* at 3-4.  Their "only involvement" with the nail gun is that they licensed the RIDGID trademark to The Home Depot. *Id.* at 4.

---

[2] Ridge Tool Company is a wholly owned subsidiary of Emerson Electric Co. and is affiliated with Ridgid, Inc. ECF Nos. 37 at 11; 37-2 at 2-3.  Ridgid, Inc. owns the "RIDGID" trademark. ECF No. 37-2 at 3.  Emerson Electric Co. and Ridgid, Inc. licensed the trademark to The Home Depot. *Id.*  The defendants do not make any analytical distinctions between the roles of the three companies, so I will proceed with the analysis as if Ridge Tool Company was the trademark licensor.

## II.  DISCUSSION

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party is entitled to a judgment as a matter of law when the nonmoving party has failed to make a sufficient showing on an essential element for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

### A.  Negligence

To prevail on a negligence theory, Hernandez must demonstrate that (1) the Ridge Tool Company owed him a duty of care, (2) it breached that duty, (3) the breach was the legal cause of his injuries, and (4) he suffered damages. *Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 153 (Nev. 2012).  Though negligence is often a question of fact for the jury, summary judgment is proper when at least one element of negligence is negated, preventing the plaintiff from recovering as a matter of law. *Id.*; *Celotex*, 477 U.S. at 323.

1    Hernandez alleges that the defendants failed to properly design, test, and inspect the nail

2    gun and that they failed to warn and give adequate instructions.  Ridge Tool Company contends

3    that it is not liable because it was "merely the licensor" of the RIDGID trademark and "otherwise

4    played no role in the design, manufacture, distribution and sale of the nail gun, or the

5    formulation of its warnings." ECF No. 37 at 4.  Hernandez presented evidence that the RIDGID

6    trademark was prominently displayed on the nail gun and its packaging and contends that

7    whether a defendant was negligent is generally a question of fact for the jury.  The parties do not

8    dispute that Ridge Tool Company's role in connection with the nail gun was limited to licensing

9    the trademark.  The question is whether that role is sufficient to impose a duty on Ridge Tool

10   Company for negligence purposes.

11   The Supreme Court of Nevada has analyzed negligence liability for a trademark licensor

12   once before, albeit obliquely, in *Dow Chemical Co. v. Mahlum*, 970 P.2d 98 (Nev. 1998),

13   *overruled in part on other grounds by GES, Inc v. Corbitt*, 21 P.3d 11 (Nev. 2001).  In *Dow*

14   *Chemical*, the plaintiff was injured by defective silicone breast implants manufactured by Dow

15   Corning, a company created and owned in part by Dow Chemical. *Id.* at 103, 106.  The plaintiff

16   sued Dow Chemical for negligent performance of an undertaking based on the theory that it

17   undertook the safety testing of the silicone compounds. *Id.* at 106-07.  In addition to testing the

18   compounds and providing other technical support, Dow Chemical also licensed the "Dow"

19   trademark to Dow Corning. *Id.* at 114, 117.  The licensing agreement allowed Dow Chemical to

20   "inspect Dow Corning's manufacturing process to assure the quality of its products" and to

21   "revoke Dow Corning's license to use the corporate name 'Dow' on any questionable products."

22   *Id.* at 105, 119.  The Supreme Court of Nevada noted that the trademark agreement was one

23   factor in assessing whether a reasonable jury could find that Dow Chemical undertook the testing

4

1  of the silicone, but that "the language in the trademark agreement, by itself, is not sufficient to

2  create tort liability on Dow Chemical's part." *Id.* at 117.[3]

3        When the Supreme Court of Nevada has not spoken on an issue, I generally must predict

4  how it would adjudicate the issue. *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007).  The

5  present claim is not a negligent performance of an undertaking claim as in *Dow Chemical*.  But

6  based on the language in *Dow Chemical*, I predict that the Supreme Court of Nevada would hold

7  that licensing the RIDGID trademark to The Home Depot, by itself, is insufficient to impose a

8  negligence duty on Ridge Tool Company to ensure the safety of the nail gun or the adequacy of

9  its warnings or instructions.  Hernandez does not provide evidence of any other factors that

10 would support Ridge Tool Company owing him a duty to ensure the nail gun's safety.

11 Therefore, I grant summary judgment in Ridge Tool Company's favor as to the negligence claim.

12 **B.  Warranty Claims**

13       Express warranties are created by affirmations of fact, promises, or descriptions of the

14 goods that become "part of the basis of the bargain." Nev. Rev. Stat. § 104.2313(1).  Implied

15 warranties of fitness arise when "the seller at the time of contracting has reason to know any

16 particular purpose for which the goods are required and that the buyer is relying on the seller's

17 skill or judgment to select or furnish suitable goods." *Id.* § 104.2315.  In Nevada, "unless there is

18 privity, liability to the consumer must be in tort and not in contract." *Amundsen v. Ohio Brass*

19 *Co.*, 513 P.2d 1234, 1235 (Nev. 1973) (quotation omitted); *see also Long v. Flanigan Warehouse*

20

---

21 [3] Justice Maupin of the Supreme Court of Nevada expounded on this issue in a partial dissent in
   *Dow Chemical*. 970 P.2d at 132.  He stated that the language in the trademark licensing
22 agreement is merely required to retain the licensor's ownership of trademark rights, and that
   there was no evidence Dow Chemical actually inspected the breast implants, so the licensing
23 agreement could not impose a duty to inspect the trademarked product nor constitute an
   undertaking to guarantee the product's safety. *Id.* at 136-37.

1  *Co.*, 382 P.2d 399, 402 (Nev. 1963) (breach of implied warranty was not an available remedy

2  absent privity, and there was no privity when the defective product was purchased by the

3  plaintiff's employer rather than the plaintiff).

4        Ridge Tool Company contends that it is a mere trademark licensor that was not involved

5  in the sale of the nail gun.  Hernandez has not provided any evidence that he was in privity with

6  Ridge Tool Company.  In fact, he alleged that his employer purchased the gun from The Home

7  Depot.  Hernandez also does not point to any evidence that Ridge Tool Company made an

8  express warranty.  Therefore, I grant summary judgment in Ridge Tool Company's favor as to

9  both warranty claims.

10  **C.  Strict Liability**

11        The defendants argue that because Ridge Tool Company only licensed the trademark but

12  played no role in manufacturing or selling the nail gun, it cannot be liable on a strict products

13  liability theory.  Hernandez responds that Ridge Tool Company is strictly liable under the

14  apparent manufacturer doctrine as restated by § 400 of the Restatement (Second) of Torts.  In

15  addition, he argues that, under the stream of commerce approach, strict liability should be

16  imposed on any entity that "take[s] part in [the] production or marketing" of a defective product.

17  ECF No. 38 at 4.  Ridge Tool Company contends that § 400 is inapplicable here because it is

18  limited to sellers of the product.  Alternatively, it relies on § 14 of the Restatement (Third) of

19  Torts to contend that the "trend" in applying the apparent manufacturer doctrine is to "absolve

20  the [trademark] licensor of alleged products liability claims" unless they "'participate

21  substantially in the design, manufacture, or distribution of the licensee's products.'" ECF No. 37

22  at 9 (quoting Restatement (Third) of Torts: Products Liability (1998), § 14, comment d

23  (emphasis omitted)).  Relatedly, Ridge Tool Company contends that trademark licensors found

strictly liable in the cases cited by Hernandez were much more involved in the product's development than in the present case.

### 1. *No Clearly Controlling Precedent in Nevada Law*

I could not find, nor did parties cite to, any Nevada law regarding whether a trademark licensor is subject to strict liability for a defective product bearing the licensed mark. The only Nevada case about the liability of a trademark licensor for a defective product is *Dow Chemical*, but that case did not involve a strict liability claim. 970 P.2d 98. In that case, the Supreme Court of Nevada stated that a trademark agreement "by itself, is not sufficient to create tort liability" for the licensor, but the agreement's "existence is one factor in assessing [the licensor's] knowledge and involvement" in the manufacture of the defective product. *Id.* at 117 (quotation omitted). Because it was stated in the context of a negligent performance of an undertaking claim, it seems apt to understand the phrase "not sufficient to create tort liability" as limiting only the negligence liability, not the strict liability, of a trademark licensor. Therefore, it is not clear that *Dow Chemical* would apply to the strict liability issue in the present case.

### 2. *Apparent Manufacturer Doctrine*

The apparent manufacturer doctrine holds vicariously liable an entity that appears to make a product but does not actually manufacture it. *See Kealoha v. E.I. du Pont de Nemours & Co.*, 82 F.3d 894, 903 (9th Cir. 1996). A rationale for the apparent manufacturer doctrine is that "the vendor who, through its labeling or advertising of a product, caused the public to believe that it was the manufacturer and to buy the product in reliance on the vendor's reputation and care in making it," should "assume[] the obligations of a manufacturer and to be estopped to deny its identity as the manufacturer." *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 201 (Ill. 1982). In Nevada, manufacturers are strictly liable for defective products. *See Ginnis v. Mapes Hotel*

1   *Corp.*, 470 P.2d 135, 138 (Nev. 1970).  So, if Nevada adopted the apparent manufacturer

2   doctrine, it would impose strict liability on apparent manufacturers.[4]

3        Section 400 of the Restatement (Second) of Torts (1965) states the rule as: "One who

4   puts out as his own product a chattel manufactured by another is subject to the same liability as

5   though he were its manufacturer."  The title and comment a of § 400 suggest it is limited to

6   sellers or suppliers of the product.[5]  However, comment d to § 400 notes that "one puts out a

7   chattel as his own product when he . . . affixes to it his trade name or trademark" because

8   consumers may frequently use the product believing that the product was made by or for the

9   apparent manufacturer and rely on the reputation of the trademark as "an indication of the quality

10   . . . of the chattel."

11       Section 14 of the Restatement (Third) of Torts: Products Liability (1998) restates the

12   rule as: "One engaged in the business of selling or otherwise distributing products who sells or

13   distributes as its own a product manufactured by another is subject to the same liability as though

14   the seller or distributor were the product's manufacturer."  Comment d to § 14 notes that the rule

15   "does not, by its terms, apply to the owner of a trademark who licenses a manufacturer to place

16   the licensor's trademark or logo on the manufacturer's product and distribute it as though

17

18

---

19   [4] The apparent manufacturer doctrine "predates by some years the advent of the doctrine of strict
20   liability," so it appears that the two doctrines evolved as distinct legal concepts. *Hebel*, 442
     N.E.2d at 201.  However, they now overlap in their application. *Id.* at 202 ("The function of the
21   apparent-manufacturer doctrine has . . . been absorbed by . . . strict liability."); Restatement
     (Third), § 14, comment b ("To the extent that nonmanufacturers in the chain of distribution are
22   held to the same standards as manufacturers, the rule stated in this Section is of little practical
     significance.").

23   [5] The title of § 400 is "Selling as Own Product Chattel Made by Another."  Comment a states
     that "[t]he words 'one who puts out a chattel' include anyone who supplies it to others for their
     own use or for the use of third persons, either by sale or lease or by gift or loan."

manufactured by the licensor," but does apply to trademark licensors "when they participate substantially in the design, manufacture, or distribution of the licensee's products."

Courts vary in the contexts in which they apply the apparent manufacturer doctrine, § 400, and § 14.  Some jurisdictions have limited the application of the doctrine only to sellers or suppliers. *See e.g., Torres v. Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1235 (9th Cir. 1989) (predicting Arizona would not apply § 400 to non-seller trademark licensor); *Burkert v. Petrol Plus of Naugatuck, Inc.*, 579 A.2d 26, 33 (Conn. 1990).  In comparison, one jurisdiction applied the doctrine to a non-seller trademark licensor merely because the licensor had authorized its name to appear on the injurious product, based on the rationale that consumers would purchase the product in reliance on the quality symbolized by the trademark. *Brandimarti v. Caterpillar Tractor Co.*, 527 A.2d 134, 139-40 (Pa. Super. Ct. 1987).  Other jurisdictions have applied the apparent manufacturer doctrine as restated by § 14, imposing liability on non-seller trademark licensors only if they are substantially involved in the design, manufacture, or distribution of the defective product. *See, e.g., Lou v. Otis Elevator Co.*, 933 N.E.2d 140, 148 (Mass. App. Ct. 2010) (adopting § 14 rule); *Ellis v. Dixie-Narco, Inc.*, No. CIV. 97-1619-K1, 1999 WL 373793, at *4 (D. Or. Apr. 26, 1999) (predicting that Oregon would require trademark licensor to be a seller, manufacturer, or substantially involved in the product design to be liable under either § 400 or § 14).

Because Nevada has not recognized or rejected the apparent manufacturer doctrine, and because other states have applied the apparent manufacturer doctrine incongruously, I hesitate to predict whether and how the Supreme Court of Nevada would apply the rule.  Therefore, I cannot conclude whether the apparent manufacturer doctrine would lead to strict products liability for Ridge Tool Company in Nevada.  Instead, I certify the question to that court.

### 3. *Stream of Commerce*

The stream of commerce approach imposes strict liability on anyone having a "participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product," rather than limiting liability to only actual sellers and manufacturers. *Kasel v. Remington Arms Co.*, 24 Cal. App. 3d 711, 725 (Cal. Ct. App. 1972). California, Illinois, and Arizona have used the stream of commerce approach to impose liability on trademark licensors that do not sell or manufacture the defective product where the licensors have participated in, to different degrees, putting the defective products into the stream of commerce. *See, e.g., Kasel*, 24 Cal. App. 3d at 725-27; *Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 161 (Ill. 1979), *Torres v. Goodyear Tire & Rubber Co.*, 786 P.2d 939, 942 (Ariz. 1990).

In *Kasel*, the plaintiff was injured by a defective shotgun shell bearing the "Remington" trademark. 24 Cal. App. 3d at 717. Remington did not manufacture or sell the shell, but it was involved in setting up the manufacturer and provided training, personnel, and consultation to the manufacturer. *Id.* at 717-19. The California Court of Appeal observed that, "Remington had more involvement in the enterprise which produced the defective shell than the typical retailer, distributor or wholesaler upon whom the courts have had no trouble imposing strict liability." *Id.* at 727. The court held that "as long as the . . . trademark licensor can be said to be a link in the marketing enterprise which placed a defective product within the stream of commerce, there is no reason in logic for refusing to apply strict liability in tort to such an entity." *Id.* at 725.

In *Connelly v. Uniroyal, Inc.*, the Supreme Court of Illinois held that a trademark licensor of a defective tire that had contracted to share profits with, and to provide technical instructions and assistance to, the tire manufacturer was strictly liable for a defective product. 389 N.E.2d at

161-63.  It held that participation in the product's distribution is not required for strict liability to

apply, based on the following reasoning:

> The major purpose of strict liability is to place the loss caused by
> defective products on those who create the risk and reap the profit
> by placing a defective product in the stream of commerce . . . .  A
> licensor is an integral part of the marketing enterprise, and its
> participation in the profits reaped by placing a defective product in
> the stream of commerce . . . presents the same public policy
> reasons for the applicability of strict liability which supported the
> imposition of such liability on wholesalers, retailers and lessors.

*Id.* at 162-63 (quotation omitted).  It went on to hold that strict liability should be applied to an

entity that, "for a consideration, authorizes the use of [its] trademark, particularly when, as here,

the product bears no indication that it was manufactured by any other entity." *Id.* at 163.

In *Torres v. Goodyear Tire & Rubber Co.*, the Supreme Court of Arizona also imposed

strict liability on a non-seller and non-manufacturer, Goodyear, which did not design,

manufacture, or distribute the product, but had "actual ability to control" the manufacturers. 786

P.2d at 941-42.  Among other things, the licensing agreement required manufacturers to make

the tires "in accordance with formulas, specifications, and directions given by Goodyear," use

materials Goodyear approved, and comply with Goodyear's instructions on labeling, marketing,

packaging, and advertising the tires. *Id.* at 942.

The Supreme Court of Arizona noted that strict liability is considered a "policy device to

spread the risk . . . to those who marketed the product, profit from its sale, and have the know

how to remove its defects before placing it in the chain of distribution." *Id.* (quotation omitted).

Based on this policy, the Supreme Court of Arizona found that "the degree of control possessed

by Goodyear . . . is a factor that militates in favor of applying strict liability to such licensors."

*Id.*  Therefore, it held that strict liability was properly applicable to Goodyear because it was "in

the business of placing products in the stream of commerce," though it was not the actual manufacturer or seller. *Id.* at 943 (quotation omitted). The court stopped short of addressing the precise question here, noting that if a defendant "merely licenses a manufacturer to use a particular . . . trademark . . . it might well be inappropriate to impose strict liability," but this was "not an issue [it] need[ed] to decide" because the facts showed that Goodyear was significantly involved in creating the product. *Id.* at 945.

In Nevada, manufacturers and distributors are strictly liable for defective products. *See Ginnis*, 470 P.2d at 138; *Shoshone Coca-Cola Bottling Co. v. Dolinski*, 420 P.2d 855, 857 (Nev. 1966). However, it is not clear that *only* those entities are strictly liable, because Nevada's stated public policy regarding strict products liability appears aligned with the stream of commerce approach as adopted by California, Illinois, and Arizona. In Nevada's seminal case of strict products liability, the Supreme Court of Nevada explained:

> The public interest in human safety requires the maximum possible protection for the user of the product . . . . By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising, and otherwise, they do everything they can to induce that belief. . . . The supplier has invited and solicited the use; and when it leads to disaster, he should not be permitted to avoid the responsibility . . . . [P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.

*Shoshone*, 420 P.2d at 857 (quotations omitted). In addition, the court noted that the rationale of strict liability is to "insure that the cost of injuries resulting from defective products are borne by the manufacturer that put such products on the market." *Id.* (quotation omitted).

The nail gun and its packaging prominently bore the RIDGID name and trademark, which are "known . . . for its hallmark characteristics of dependable and reliable performance,"

1    and no other branding. ECF Nos. 37-2 at 3; 38-1; 38-2.  On the other hand, the parties do not

2    dispute that Ridge Tool Company's only role here was licensing its trademark.  Even if Nevada

3    were to follow California, Illinois, and Arizona in extending strict liability beyond actual sellers

4    and manufacturers under the stream of commerce approach, it is unclear what additional

5    conduct, if any, a trademark licensor would need to engage in to be considered as participating in

6    the stream of commerce.  Therefore, I hesitate to predict whether the Supreme Court of Nevada

7    would or would not extend strict liability to Ridge Tool Company under the stream of commerce

8    theory.  Instead, I certify the question to that court.

9        **4.  *Question for Certification***

10       In my discretion, "[w]hen state law issues are unclear, [I] may certify a question to a

11   state's highest court to obtain authoritative answers." *Potter v. City of Lacey*, 46 F.4th 787, 791

12   (9th Cir. 2022) (quotation omitted).  Certification may be appropriate for state law issues that

13   carry "significant policy implications" and "will have broad application." *Id*.; *Kremen v. Cohen*,

14   325 F.3d 1035, 1038 (9th Cir. 2003).  Nevada Rule of Appellate Procedure 5 permits me to

15   certify a question of Nevada law "which may be determinative of the cause then pending" in my

16   court when "it appears to [me] there is no controlling precedent in the decisions of the Supreme

17   Court or Court of Appeals of [Nevada]."  The certified question does not have to resolve or

18   conclude the entire case; it only needs to be determinative of "part of the federal case." *See Volvo*

19   *Cars of N. Am., Inc. v. Ricci*, 137 P.3d 1161, 1164 (Nev. 2006) (en banc).

20       Whether strict liability applies to a mere trademark licensor is a question of broad

21   application that will determine the outcome of this case as to Ridge Tool Company.  There is no

22   clearly controlling Nevada precedent.  The scope of strict products liability is an important

23   question of state law that should be left to the state court. *See Torres v. Goodyear Tire & Rubber*

*Co.*, 867 F.2d 1234, 1239 (9th Cir. 1989) (certifying a similar question to the Arizona Supreme Court); *see also Rivera v. Philip Morris*, 209 P.3d 271, 274 (Nev. 2009) (en banc) (certification regarding the evidentiary burden in a strict liability case was appropriate).  Therefore, I will certify by separate order the following question to the Supreme Court of Nevada:

- Does Nevada impose strict products liability on an entity whose only involvement with a defective or unreasonably dangerous product is to license its trademark to be used to market the product and where the product and packaging prominently display its trademark?

In the interim, I deny the defendants' motion for partial summary judgment as to the strict liability claim without prejudice to refiling it within 30 days of the Supreme Court of Nevada's decision on the certified question.

**III. CONCLUSION**

I THEREFORE ORDER that the defendants' motion for partial summary judgment (**ECF No. 37**) is **GRANTED** as to the negligence, express warranty, and implied warranty of fitness claims, and **DENIED** without prejudice as to the strict liability claim.  The defendants may file a new motion as to the strict liability claim within 30 days of the Supreme Court of Nevada's decision on the certified question.

DATED this 18th day of December, 2023.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE